Rita Patricia KEEFE, Plaintiff,

v.

**BAHAMA CRUISE LINE, INC., Defendant.**

No. 86–12–CIV–T–17.

United States District Court, M.D. Florida, Tampa Division.

March 31, 1988.

Edward F. Gerace, Tampa, Fla., for plaintiff.

David F. Pope, Tampa, Fla., for defendant.

**MEMORANDUM OPINION**

KOVACHEVICH, District Judge.

This matter came on for trial on March 15, 1988, before this Court, sitting without a jury. Plaintiff Rita Patricia Keefe claims that she fell and sustained injury on board the cruise ship S/S Vera Cruz on June 4, 1984, due to the negligence of Defendant.

After consideration of the testimony, exhibits, pre-trial stipulation, and arguments of counsel, the Court makes the following findings of fact and conclusions of law. To

the extent any finding of fact might constitute a conclusion of law, it is adopted as such. Conversely, to the extent any conclusion of law constitutes a finding of fact it is adopted as such.

## FINDINGS OF FACT

1. Plaintiff Rita Patricia Keefe was at all times relevant to this cause of action a resident of Pinellas County, Florida.

2. Defendant Bahama Cruise Line, Inc., is a foreign corporation doing business in Hillsborough County, Florida.

3. At all times material to this action, Defendant was the owner and operator of the S/S VERA CRUZ and was the party issuing passage contract tickets for the voyage of June 2 to 4, 1984.

4. Prior to June 2, 1984, Plaintiff, along with members of her bowling team, decided to take a two-day "Cruise to Nowhere" on board the S/S VERA CRUZ, a vessel operating out of the Port of Tampa, Florida. Plaintiff's occupation at this time was hairdresser.

5. The cruise was booked through Mission Travel which was owned by Dottie Brown, a member of the same bowling team. All the arrangements were handled by Ms. Brown and the team captain Roger Brown. Roger Brown retained possession of the passage contract tickets until boarding, on June 2, 1984. Plaintiff was handed her ticket at the top of the gangplank by Roger Brown. The passage contract ticket contained a provision that required suit for personal injury to be filed within one year of the date of injury. (Depo. R. Keefe, pgs. 8–10 and Pl.Ex. 5).

6. On June 4, 1984, Plaintiff went to the outdoor dance floor, Disco under the Stars, to dance. Sometime between 1:00 a.m. and 3:00 a.m., while the vessel was proceeding to its dock through the navigable channels of Tampa Bay, Plaintiff slipped and fell on the dance floor.

7. This dance floor is located on the Aztec or A deck, on the outside of the vessel behind the smokestack.

8. At the time of the injury, the area was a place where passengers were invited by Defendant to dance. There was a bar where alcoholic beverages were sold. The dance floor was a grey color. According to Defendant, it was painted with non-skid paint, and was surrounded with green indoor/outdoor carpet. (Depo. H. Teuben, pg. 15). However, Plaintiff's witness, Roger Bishop, testified that the steel deck did *not* have a non-skid surface; that on both evenings he had found the dance floor area treacherous for leather soles, and, that it was dirty; and, that at the time of the incident, moisture from the June night was present. There were lounge chairs in the area around the dance floor. The only portion of the floor that may have had a canopy over it was the area of the bar and immediately adjacent to the bar. Plaintiff was dancing in an open area away from the bar, and near the carpeted surface.

9. On the night of the accident, the dance floor was slippery and sticky. Patrons of the bar often carried their drinks across the dance floor, the inference being that these drinks were spilled on the dance floor. In fact, Plaintiff stated that the dance floor had been sticky from the first night and everyone had been dancing cautiously. To the best of Plaintiff's knowledge the dance floor had not been cleaned since she boarded the ship.

10. The weather that night was moderate, warm with a damp night air. There was no rain that night; in fact, Plaintiff recalled that it did not rain at any time during the cruise.

11. Plaintiff was wearing shoes with low, fat heels. Plaintiff was dancing a moderately fast dance when she fell. As she was dancing, all of a sudden she hit a wet spot and her right foot when out from under her. She twisted and attempted to break her fall; in doing so she jammed her right arm into the floor and and landed on her coccyx bone.

12. Plaintiff stated that at the time of the injury she thought that the bar may have been closed so she wasn't sure if there was a bartender in the area at the time. She thought that the person playing records for the dancers was a ship's employee.

13. Plaintiff got up and left the dance floor. When she bent over to get her drink, she found that she could not straighten back up. She had her roommate help her back to the cabin where she changed clothes and returned to the area around the dance floor and sat in a chair.

14. Her condition did not improve, so she returned to her cabin and went to bed. The ship docked in Tampa at approximately 4:30 a.m. that morning and she departed the ship at approximately 7:30 a.m. on June 4, 1984.

15. Plaintiff did not, before leaving the ship, report the accident to any officer or crew member of the VERA CRUZ, nor did she seek on board medical treatment.

16. On June 5, 1984, Plaintiff went to Dr. Harvey Gars, a chiropractor, for treatment. (Pl.Ex. 7–M). Dr. Gars treated Plaintiff with spinal manipulations and a table with roller bars. Plaintiff had followup visits with Dr. Gars on June 6, 8, 9, 11, 12, 13, 14, 18, 19, 21, 25, 28, 29, and July 1 and 3, 1984. His diagnosis on June 5 was thoracic strain, sacroiliac strain and severe sacroiliac and thoracic strain. (Pl.Ex. 7–M).

17. Next, Plaintiff began treatment with Dr. Harry Steinman, an orthopedic surgeon. Plaintiff first saw Dr. Steinman on July 9, 1984, with discomfort in the thoracic and lumbar spine with radiation into left leg. (Depo. H. Steinman, pg. 3, 13). At that time, she was sent for diagnostic studies and placed on Clinoril. The diagnostic studies revealed no objective findings. (Depo. H. Steinman, pgs. 5–6).

18. When seen on July 27, 1984, Plaintiff had a decrease in discomfort, spasm, and pain in upper thoracic and neck, with continuing discomfort in lower back brought on by prolonged sitting and some pain on walking. Objectively, Plaintiff had a positive Tinel sign, in both upper extremities, indication irritation of the peripheral nerve. Plaintiff was referred for a study of peripheral nerves and electromyelogram. At that time, Dr. Steinman noted Plaintiff could return to work on August 6, 1984. (Depo. H. Steinman, pgs. 6–8).

19. The results of the neurological tests were in normal ranges. (Depo. H. Steinman, pg. 9).

20. When seen on August 17, 1984, Plaintiff reported low back pain with radiation into right leg and episodic numbness in fingers. Plaintiff reported that pressure, tension and standing at work intensified her symptoms. Plaintiff had a positive straight leg raising which could be indicative of nerve root irritation. X–rays were normal, except for moderate arthritis at L/5–S/1. (Depo. H. Steinman, pgs. 8–10).

21. Plaintiff was seen on September 14, October 18, and November 29, 1984, and the findings were within normal limits on those occasions. Dr. Steinman's assessment was gradual improvement. His diagnosis of Plaintiff's condition was lumbosacral contusion with sprain, probably in the area of the thoracic spine. (Depo. H. Steinman, pgs. 10–13).

22. In or about January 1985, Plaintiff moved to Memphis, Tennessee to live with James Sullivan, who she married August 22, 1986. At that time her son, who was about twelve (12) years old, moved in with his father, where he lived until the summer of 1987.

23. In Memphis, Plaintiff started seeing Dr. Dan Scott, an orthopedic surgeon. She was first seen February 14, 1985, and reported pain from her neck to her feet, right arm pain with radial numbness, loss of control of muscles of fingers, pain on coughing or sneezing and extended sitting, lying, or standing, and a diagnosis of arthritis. Dr. Scott found no reason for the pain and problems that she stated that she had. The x-rays showed no significant abnormalities or signs of arthritis. Dr. Scott referred Plaintiff to Dr. Huffman for rehabilitation on the back. (Depo. D. Scott, pgs. 6–11).

24. When seen on March 4, 1985, Plaintiff had a flat back, which is indicative of back pain, and marked restriction of motion. Additionally, Plaintiff exhibited tender reflexes and pain on straight leg raising. Dr. Scott referred Plaintiff to Dr. Miller for evaluation of a possible disc problem. (Depo. D. Scott, pgs. 12–14).

25. Dr. Miller admitted Plaintiff to the hospital and did a CT scan of the lumbar spine. The findings were normal, making the possibility of a disc problem unlikely. The scan showed a mild degenerative change at L/5, indicating arthritis due to aging. (Depo. D. Scott, pgs. 12, 23–24).

26. Plaintiff was seen on March 29, 1985, with a normal neurological examination. Dr. Scott gave her a steroid shot in the shoulder. (Depo. D. Scott, pgs. 16–17).

27. Plaintiff did not return to Dr. Scott until February 24, 1986, when she reported pain in back, neck, shoulders, upper dorsal spine and right arm, the left index finger and left foot were numb and tingly. There were no objective findings at that time. Dr. Scott suggested Plaintiff see Dr. Patterson, a neurosurgeon, but there is no evidence she ever saw Dr. Patterson. (Depo. D. Scott, pgs. 17–19).

28. Dr. Scott's diagnosis was residual cervical, dorsal, and lumbar sprain of the muscle for which an exercise program had not adequately compensated. He stated that bending, stooping, or prolonged standing could aggravate Plaintiff's discomfort, but would *not* worsen her condition. He placed no restrictions on her and expected full recovery if she did the rehabilitation as recommended. (Depo. D. Scott, pgs. 20–26).

29. Plaintiff saw Dr. John Huffman, physical medicine and rehabilitation, approximately fifteen (15) times from mid–1985 until mid–1986. (Depo. C. Damske, Ex. 1).

30. Sometime in 1986, Plaintiff moved to Nashville, Tennessee where she saw a Dr. Meechum, who told her to try dancing or bowling. She did not because her husband would not let her. She stayed in Nashville approximately one year.

31. After Nashville, Plaintiff moved to Bowling Green, Kentucky.

32. Plaintiff stated she did not work after she moved to Memphis because her husband became overprotective and would not let her work. For the same reasons, she did not work when she lived in Nash-ville, Tennessee or Bowling Green, Kentucky.

33. In the summer of 1987, Plaintiff returned to Florida and at the time of the hearing was residing in Palm Harbor. She began working January 1, 1988. She operates a penny press at the Kapok Tree; the machine makes copper jewelry from pennies.

34. Plaintiff stated that now she does pretty good normally. When she becomes tense she experiences pain in the lower back and arm. She said it was like there "... was lot of physical damage and now almost mental—I get under stress or I get nervous, or whatever, and its like it wants to started all over again." (Depo. R. Keefe, pg. 48). Plaintiff is no longer on prescription medication but takes analgesics as needed. She discontinued the prescription medication approximately one and one-half years ago.

35. Plaintiff filed suit in the instant cause of action on November 15, 1985, in the Circuit Court in and for Hillsborough County, Florida.

36. On May 14, 1985, Plaintiff's attorney Saxton Gaskin, III, wrote Defendant concerning his representation. Defendant, in response and through its claims manager Allison Styskal, telephoned Mr. Gaskin and advised him that Plaintiff had given them a release of liability and that her medical bills had been paid in full. Ms. Styskal further represented to Mr. Gaskin that the release would be provided to him with a copy of the draft or check in payment of the medical bills.

37. The statements made by Ms. Styskal were not true and served to confuse and delay the presentation of Plaintiff's claim. Mr. Gaskin attempted to verify the information by contacting Plaintiff in Tennessee and Dr. Gars' office. Dr. Gars' office read him a letter suggesting a release could have been made. Mr. Gaskin would have filed suit within one year of the date of injury except for the misrepresentations made to him regarding the settlement of the claim.

## CONCLUSIONS OF LAW

1. This Court has jurisdiction of the persons and subject matter of this cause of action pursuant to 28 U.S.C. §§ 1332 and 1333.

 2. Defendant Bahama Cruise Lines, Inc. is estopped from asserting the passage contract ticket limitations argument based on equity and good conscious. The claim is not time-barred.

3. Defendant Bahama Cruise Lines, Inc. owed a duty of care to Plaintiff on board the S/S VERA CRUZ. Defendant breached that duty and was negligent in the maintenance of the area of the ship where Plaintiff's injury occurred, to wit: the deck area designated as the dance floor. Plaintiff sustained injury and damage in the fall of June 4, 1984, which was proximately caused by Defendant's negligence.

4. Plaintiff Rita Patricia Keefe is entitled to reimbursement of the medical costs relating to the injury sustained as a result of Defendant's breach of its duty. Plaintiff is entitled to a judgment in the amount of $3,657.60 for medical costs. This amount excludes $75.00 claimed for dental work as there is insufficient evidence to find those costs attributable to the compensable injury.

5. The Court finds that Plaintiff Rita Patricia Keefe is not entitled to lost wages for the period following her move to Memphis, Tennessee in January 1985, Plaintiff's non-employment from then to January 1, 1988, was the result of the wishes of Plaintiff's husband, rather than to an inability to work or to restrictions imposed by any treating physician. Plaintiff has failed to prove by competent evidence that she had suffered future loss of income proximately caused by the compensable injuries.

6. Plaintiff Rita Patricia Keefe is entitled to a judgment in the amount of $7,000.00 for damages sustained in her fall of June 4, 1984, aboard the S/S VERA CRUZ resulting from Defendant's breach of duty to Plaintiff. Of this amount, $3,300.00 is attributable to lost wages for the period June 4, 1984 to December 31, 1984, and $3,700.00 is attributable to pain and suffering. Accordingly,

The Court reserved ruling on certain motions and proffers made at trial. Plaintiff proffered to the Court Plaintiff's Exhibit 2, Mortality Tables. The proffer is accepted and Plaintiff's Exhibit 2 is admitted into evidence. Defendant's motion for directed verdict is denied. Any motion not specifically ruled upon herein is denied.

The Clerk of the Court will enter a judgment in favor of Plaintiff Rita Patricia Keefe and against Defendant Bahama Cruise Lines, Inc., in accordance with this order.